THE STATE v. DAN EVANS, Appellant.—68 S. W. (2d) 705.

Division Two, February 23, 1934.

*Emanuel Williams* for appellant.

*Roy McKittrick,* Attorney-General, and *William W. Barnes,* Assistant Attorney-General, for respondent.

ELLISON, P. J.—The appellant, Dan Evans, and two other negro youths were charged by indictment in the Circuit Court of the City of St. Louis with murder in the first degree, the fatal stabbing of one Manuel Glatstein. One of the three defendants took a severance. The appellant and the other remaining defendant were twice tried and convicted but both times got a new trial. A severance was then granted the second defendant and the appellant was tried a third time, alone. He was convicted and his punishment assessed by the jury at life imprisonment in the penitentiary. He appeals but has filed no brief. The assignments in his motion for new trial complain mainly that the verdict was against the weight of the evidence: that the testimony of the State's witnesses was conflicting and self-destructive. One assignment challenges the admission of evidence; another the ruling of the trial court on remarks made by the circuit attorney; and there is further insistence that the punishment imposed was cruel and inhuman, resulting from the jury's prejudice and passion because the appellant is a negro and the deceased Glatstein was a

white man. These assignments will be noticed in the course of the opinion, so far as they are entitled to review.

A witness for the State, Caroline Anderson, lived in an upstairs room at 1404 North Fourteenth Street in St. Louis. On Saturday night, October 25, 1930, shortly before eleven o'clock, she heard a noise outside and rushed out on her porch where an electric light was burning; and there was another similar light on an adjacent porch. The witness looked into the court below and saw the appellant Evans with two other "boys" standing over a white man hitting down at him. The white man was hollering. The witness called out saying, "What are you boys doing over there?" The three boys didn't answer. The witness then declared, "I am going to tell" and the appellant and the two other culprits ran with the appellant in the lead. He had on a cap, which the witness said she would call a "police cap" or porter's cap. The assistant circuit attorney handed her a cap which had been marked as an exhibit, and started to ask her if that was the cap appellant was wearing at the time. She interrupted, answering: "That kind of a looking cap. His cap was brand new." She recognized the appellant and the other two boys, all of whom she had known for two months or more. She also knew the man assaulted, Glatstein. There was no lamp in the court below but the two lights from the porches shone down there.

She stood looking for a while and then went back into the house to resume her washing. When she left, Glatstein was kneeling down on his hands and knees. Not long afterward her "old man" Andrew Irvin, with whom she was living, came up and told her about the occurrence. She didn't discuss the assault with anyone but Irvin, although she saw another man and woman on an adjoining porch also looking down, from that Saturday night until the following Tuesday at which time she told the police.

On cross-examination she was interrogated from a transcript about testimony she had given at the coroner's inquest. She denied that in answering questions there she had stated she did not know who the white man on the ground was. She also repudiated several other answers in this transcript purporting to have been given by her at the inquest. But while she was obviously an ignorant negro woman, under rigid cross-examination she described in detail and with reasonable clearness what she did out on the porch, the arrangement of the alleys and areaways below, what objects tended to obstruct her view, etc., and the movement of the three defendants.

Andrew Irvin, who said he was the common-law husband of the previous witness, Caroline Anderson, testified that about 10:30 on the night of the homicide he was crossing the street to his home. He saw three negro men struggling with a Jew whom he had seen around the neighborhood for twelve years but whose name he did not know. It is not clear from this witness's testimony just where the assault

was taking place but he said he had been standing for ten minutes on Fourteenth Street twenty feet from a "gangway," watching the struggle when the three negroes looked up and saw him and ran out of the gangway into a blind alley. He identified the appellant and the two other indicted negroes as the ones engaged in the struggle. The witness further said about the time the three negroes saw him he walked on up the stairs to his room and that about the time he got up there Caroline Anderson came out on the porch. This part of his testimony is not clear, but apparently when he got to the top of the stairs he could still see the negroes running. He told his wife to say nothing about the matter and he, himself, didn't tell the police for two months. He admitted that at a former trial he testified he knew nothing about the homicide and was in bed when it occurred. This, he said, was because one of the indicted negroes "put his pack on me." But in the trial from which this appeal is taken, while the record report of his testimony is confusing, it appears he testified in part from a diagram or map, and that he spoke positively and without much contradiction about his own movements and those of three negro assailants.

Julia Lott lived at 1406 North Fourteenth Street. About 10:30 on the evening of the homicide, she heard a "hollering" and went from her room out into the street. Continuing she said: "I stood there talking to a pretty good bunch out on the street at 1404—at 1400, at the next gangway, and said, 'Oh, my God, is the man dead?' And Dan Evans came out of the gangway—where I live in 1406, and goes to 1400, and he comes on back and he said, 'No, the son-of-a-bitch ain't dead. He is crawling out there on his knees.'" After making this statement Evans, the appellant, went into the house of Sam Boyd, another of the indicted negroes. He had on a cap similar to a porter's cap or like a dress cap. The cap which had previously been marked as an exhibit and shown to the witness Caroline Anderson was here exhibited to this witness and she said it was like the cap the appellant was wearing that night.

The foregoing were the only eyewitnesses to the assault called by the State. Two or three others saw or heard men running just afterward but could not identify them. Officer Grady was summoned to the scene about 10:30. He found Glatstein lying in a areaway. He was sobbing and breathing heavily. His wife, Dora Glatstein, came up and the two engaged in conversation in Jewish or German. Mrs. Glatstein testified her husband told her he was going to die, and that three negro neighbors, one named Sam, had accosted him on the street, asked for a cigarette. and then pulled him into the yard and robbed and stabbed him. Glatstein was taken to the city hospital where he died at three in the morning of the stab wounds. The appellant was arrested at eight o'clock that morning. He was wearing the cap which the State had offered in evidence. His counsel objected to the introduction of the cap on the ground that it had

not been sufficiently identified as the one worn by the appellant at the time the State's witnesses claimed to have seen him engaged in the assault and in flight thereafter. On being reminded that he had admitted the cap was the one worn by appellant when arrested, counsel for appellant then further objected that the only purpose in introducing the cap was to inflame the jury. There was further testimony for the State that the appellant at the time of his arrest made a false statement as to where he resided. It was developed that he had rented the room where he claimed to live at one o'clock in the morning following the homicide and remained there only until six o'clock in the morning.

The defense was an alibi. Also testimony was introduced contradicting statements made on the stand by the State's eyewitnesses, and proving contradictory extrajudicial statements made by them. In particular the defense made an elaborate showing that the premises at 1404 Fourteenth Street were so poorly lighted persons standing on the second story porches could not see at night to identify men in the courtyard and areaways below.

I. The first assignment in the motion for new trial is a general assignment "that the verdict is against the evidence and the weight thereof, in the following, to-wit." The motion then specifically refers to the testimony of three of the State's witnesses, Caroline Anderson, Julia Lott and Andrew Irvin. As to the witness Caroline Anderson it is pointed out that at the trial below she testified she recognized and identified from an upstairs porch the three negro men and Glatstein, the man they were assaulting, in the courtyard below. As against this testimony the motion refers to her testimony at the coroner's inquest where she said she did not know the man who was being beaten other than that he was white. The motion for new trial then asserts "such a conflict in testimony was such as to render the weight of the said Caroline Anderson's testimony almost *nil.*" It is needless for us to say this is little more than argument on the weight of the evidence.

The motion next refers to the testimony of Andrew Irvin who said he stood on the sidewalk for about ten minutes and saw the three negroes struggling with Glatstein. The motion then asserts "that the testimony on the part of Andrew Irvin and Caroline Anderson is of such wide variance, that a verdict of guilty, rendered as a result of said testimony, is against the weight of said evidence and is unwarranted." Here again the motion does nothing more than to argue the weight of the evidence.

Again, the motion says "the testimony of one Julia Lott is of such wide variance with that of Andrew Irvin, and who was in the same place of vision as was the said Andrew Irvin, that a verdict of guilty, rendered as a result of such testimony is against the weight of the evidence." All these assignments were properly addressed to the

trial court, which had the right to set aside the verdict as being against the weight of the evidence, but they can be of no avail in this court. [State v. Young, 119 Mo. 495, 525, 24 S. W. 1038, 1047; State v. Scobee, 331 Mo. 217, 53 S. W. (2d) 245, 250.]

In another paragraph the motion refers to the testimony given by the State's witness Caroline Anderson at a former trial of the case, in which she said her common-law husband, Andrew Irvin, was asleep at the time of the assault; that the noise awakened him; and that she told him about it. This, of course, was in conflict with the testimony of both Caroline Anderson and Andrew Irvin at the last trial below from which this appeal was taken; but the conflict is no ground for reversal of the case on appeal.

II. The motion further assigns that the court erred in admitting the coat and cap worn by the appellant for the reason "that said exhibits could serve no other purpose than to inflame the minds of the jury, and did inflame the minds of the jury." There is no merit in this assignment. We do not find anything in the record showing the defendant's coat was introduced in evidence. The cap was, as our statement of facts shows. But whether both the coat and cap were introduced or only the cap, it makes no difference. They were competent. [16 C. J. 1053, p. 549; State v. Neal, 178 Mo. 63, 72, 76 S. W. 958, 960; State v. Duffy, 124 Mo. 1, 10, 27 S. W. 358, 360.]

III. The next assignment complains that the trial court erred in overruling the appellant's objection to a comment made by the circuit attorney as follows: "The reason why Mr. Williams (appellant's counsel) used Mrs. Brinkley as a witness, is because he, Mr. Williams, talked it over with Mr. Allen, the lawyer who tried the other cases." The motion asserts this comment was improper because it formed no part of the record and the defendant had no opportunity to refute it; and that it was prejudicial and tended to discount the witness's testimony. We do not find any such remark made by the circuit attorney in the record brought here. If it was made, it evidently was in argument and the argument is not preserved in the bill of exceptions. But as we have often held the State's counsel have a right to draw conclusions from the testimony in the record when they are fairly justified even as matters of inference. There was no error in the circuit attorney's comment, if it was made. [State v. Francis, 330 Mo. 1205, 1212, 52 S. W. (2d) 552, 555.]

IV. The remaining three assignments generally are to the effect that the appellant did not receive a fair trial; that the testimony offered by the State, if all the parties had been of the same race (in other words, if the appellant were not a negro) would have resulted

in an acquittal; and that the verdict, rendered within four hours after the case was presented to the jury, was the result of passion and prejudice. We see nothing in the record to justify these contentions. The murder was brutal. While the State's witnesses were ignorant, sometimes indefinite and sometimes contradictory, their testimony was substantial and for the jury. We dare say a white man probably would have received the same punishment at the hands of a jury on the same evidence. There is no indication of passion or prejudice. The appellant had been convicted twice before by other juries. There is nothing to warrant a reversal and remanding of the cause.

We find no error in the record proper and the judgment and conviction are accordingly affirmed. All concur.