THE STATE v. WALTER GREGORY, Appellant.—96 S. W. (2d) 47.

Division Two, June 30, 1936.

*R. F. Baynes* and *Bradley & Noble* for appellant.

*Roy McKittrick*, Attorney General, and *Russell C. Stone*, Assistant Attorney General, for respondent.

ELLISON, J.—The appellant was convicted of robbery in the first degree with a pistol in the Circuit Court of Pemiscot County on change of venue from New Madrid County, and his punishment fixed by the jury at ten years' imprisonment in the penitentiary. His motion for new trial contained forty-three assignments of error, which have been reduced to twenty-four in his brief here. They complain that the evidence was insufficient to support the verdict; of the admission of testimony on direct and cross-examination, and in rebuttal; of improper direct and cross-examination; of the giving and refusal of instructions; and of the refusal to grant a new trial because of newly discovered evidence.

The victim of the robbery was Fred Thompson who conducted a store and gasoline filling station on a highway running along the

bank or dump of Ditch No. 6 about seven and one-half miles east of Malden in New Madrid County. It is not disputed that the robbery occurred about nine-thirty or ten o'clock the night of September 7, 1933. But the appellant maintains the proof establishing his alibi defense was so strong, and the testimony of the prosecuting witness, Thompson, and his wife identifying him as one of the robbers was so weak and thoroughly impeached, that the verdict ought not to stand.

Thompson's testimony was that three men in a Ford automobile drove up to the filling station just after he had closed for the night, and said they wanted to buy some gasoline. He demurred about selling it but consented when they told him they would buy a tank full. He operated the gasoline pump with one hand and held a flashlight in the other while one of the men, whom he identified at the trial as Schaffer, held the hose nozzle in the tank—which overflowed after taking only two gallons. Thompson put the cap on the tank, and as he did so the appellant, who had been standing with his foot on the running board, and Schaffer threw him to the ground and took a pistol from his pocket. While they struggled his wife came out and beat Schaffer off of him with a shotgun. When he straightened up the appellant shot at him three times. He ran into the house for another shotgun and someone shot at him three times again, one bullet making a superficial wound over his left ear. By the time he had returned to the house door with his gun the robbers had fled and their car was about forty yards down the road.

He identified a pistol produced at the trial as the one taken from him by the robbers. It belonged to a man named Gratis Ellis who had pledged it to him about a month before the robbery for groceries. Mr. Ellis also identified the pistol. In addition to the pistol the robbers got the two gallons of gasoline and his flashlight. Mrs. Thompson was struck and wounded by the robbers. That night the moon was shining but there was no other light at the filling station except his flashlight and an ordinary coal oil lamp back in the middle of the store. The front of the store was ten feet from the gasoline pump.

On cross-examination Thompson said that prior to the robbery he knew Schaffer well enough to recognize him when he saw him, though he did not know his name until sometime afterward; and that he had similarly known the appellant four or five years. But it was proven in behalf of appellant that Thompson talked to some of his neighbors less than an hour after the robbery occurred, and to others within a period of three days, to all of whom he stated he did not know who the robbers were.

Dessie Crawford, Bernie Ellis, Shelby Lockaby and J. A. Whitledge, marshal at the nearby town of Gideon and deputy sheriff, testified that Thompson said he did not know who had robbed him, though he told Whitledge he thought he could identify some of the

robbers. To Dessie Crawford he also said one of the robbers was a big man, whom he believed he could identify, and he stated to Lockaby he would like to see the big fellow again. The big man was Schaffer. Also, two other neighbors, Alex Shrowder and Bill McGee, swore that Thompson told them, respectively, he thought a man named Floyd Acres, who once had worked on his farm, was one of the robbers. On the stand Thompson denied having made these statements. R. C. Wells, a neighboring farmer, testified that on the morning next after the robbery Thompson told him he did not know who the robbers were; that there was one face he would know. On this same morning Thompson reported to Gratis Ellis, that the robbers had taken his (Ellis') pistol and Mr. Ellis testified that when he asked Thompson "if he had any idea about who it was," the latter answered that he did not. "After that," Ellis said on redirect examination, Thompson told him he thought he could identify the robbers if he saw them again, but the witness was not asked what time he referred to by the expression "after that."

About a week after the robbery Thompson called J. A. Whitledge, the marshal and deputy sheriff above mentioned, and had him go with him to a house on his (Thompson's) farm into which a strange old man had moved the day of the robbery. The old man was sick and wouldn't have a doctor or let anyone look at him, and Thompson said he "sorta thought he was the one Mrs. Thompson shot," in the robbery, or that it could be the man. A short time before that, apparently, Thompson had got the witness R. C. Wells to go see the old man, taking a bottle of liniment in the hope that the aged stranger would permit Wells to rub him with it.

Thompson admitted on the stand that he did not disclose to his neighbors and the other witnesses mentioned the fact that he recognized the appellant as one of the robbers at the time of the robbery. His explanation for this was that he "had more sense" than to tell "outsiders." But the further fact was developed that he failed to acquaint the sheriff, Mr. Harris, with that information when the latter came to his filling station the next day to investigate, and contented himself with giving a description of the three robbers. Thompson accounted for his failure to advise the sheriff of this important fact by saying he thought the appellant was in the penitentiary at the time of the robbery—under a conviction for another robbery in the Circuit Court of Dunklin County the latter part of the previous July. From the testimony of the sheriff and Thompson it appears that Thompson did not say anything to the sheriff implicating appellant until about the middle of January, 1934, about three months after the robbery. The sheriff then called up Kennett, the county seat of Dunklin County, and learned that the appellant was out on bond at the time of the robbery here involved, following his conviction

in the Dunklin County Circuit Court of the other robbery. There-upon the sheriff or one of his deputies filed a complaint under which the appellant was arrested and confined in jail, and Thompson did not swear to a complaint against him until about a month later on February 13.

Mrs. Thompson was in bed when the three robbers drove up to the filling station. She heard the gasoline hose nozzle drop to the ground and the struggle that followed. Immediately she got a shot-gun, went around the house, and fired a shot at one of the robbers whom she designated at the trial as Flowers. One of the robbers, taller than the other two, was on top of her husband and the appellant was kneeling down or squatted by him. She recognized the appellant when she first saw him. She had known him for twenty years. The big fellow, Schaffer, wrenched the shotgun from her hand and she was thrown to the ground. Flowers hit her in the hand with a pistol while she was down. She did not know Flowers at the time but knew his face the next time she saw him.

She was asked if she did not tell Dessie Crawford later that night when some of the neighbors gathered at the filling station after the robbery that she did not know any of the robbers. She said she could not remember making that statement but that she did say she could identify "the big fellow," and she declared she told her hus-band that she had recognized the appellant. Being asked why she had withheld that information from her neighbors she said "any one with any sense wouldn't tell anyone, you wouldn't tell anyone if the party was running loose, and had come and tried to kill you like they did us." Crawford testified that she did say she did not know who the robbers were.

Mrs. Thompson was further asked if on the same occasion she had not said to Bernie Ellis that she did not know who the robbers were and could not identify them, and she said she did not. Mr. Ellis testified that she did make that statement probably twenty minutes after the robbery. Mrs. John Choat was at the Thompson store the Sunday afternoon or evening following the robbery. She testified that Mrs. Thompson said she could not identify any of the robbers ex-cept the large man, but Mrs. Thompson on cross-examination denied it. She further explained she did not tell the sheriff she had recog-nized the appellant as one of the robbers because every one told her the appellant was in the penitentiary.

The appellant testified that on the day of the robbery, and for some considerable time theretofore and thereafter, he was working in Noah Boyd's logging camp eight miles southeast of New Madrid; that he slept that night with Jim Castleberry, a timber cutter, in a large tent where all the workers slept, and that he had nothing to do with the robbery. This alibi was supported by the testimony of

Castleberry, and of A. O. Pixey, a timekeeper at the camp, Roy Carter, a teamster, Jack Householder, a timber cutter, and Noah Boyd, who ran the camp. Three of three witnesses testified the appellant slept at the camp that night, retiring about eight-thirty o'clock, and Castleberry corroborated the appellant's statement that they slept together. Boyd and Carter said only that the appellant worked at the camp during the day and ate supper there about seven o'clock. It was further shown that rain fell that night, and that about a third of the sixteen miles of automobile road between the camp and the Thompson filling station was almost impassable. (It will be remembered the robbery occurred about nine-thirty or ten o'clock.) The time book showed appellant had worked that week and Boyd produced a canceled check to appellant dated September 16 which he said covered his wages for the two weeks preceding.

Cross-examination of these witnesses developed some contradictions and improbabilities in the details of their stories, and showed their memories were blank as to the appellant's whereabouts on other dates, and indicated the time book was crudely kept. It was also proven that the witness Noah Boyd was the appellant's brother-in-law. Other facts will be stated as necessary in the course of the opinion.

I. Appellant's first assignment of error is that the verdict was the result of passion and prejudice, and not based upon substantial evidence. His specific contention is that the State's evidence was very weak and was completely overcome by evidence favorable to his defense; and he maintains that in these circumstances this court should weigh the evidence and reverse the judgment. In support of his legal position appellant refers us to State v. Liston, 315 Mo. 1305, 1313, 292 S. W. 45, 48; and cases cited therein. The Liston case quotes (substantially) the following from State v. Prendible, 165 Mo. 329, 353, 65 S. W. 559, 566: "Under statute (now Sec. 3734, R. S. 1929; Mo. Stat. Ann., sec. 3734, p. 3272), it is one of the grounds for a new trial that the 'verdict is contrary to the evidence. . . .' And this statutory ground is clearly comprehensive enough to embrace within its scope . . . testimony impeached in all its more prominent features and bearings, for testimony completely impeached is no testimony at all, and no conviction based on such testimony should be permitted to stand when called in question in an appellate court." The Prendible case cites State v. Huff, 161 Mo. 459, 487, 61 S. W. 908, 1104, which says: "Testimony completely impeached is no testimony at all, and rests on the same basis, in legal contemplation, as though no testimony had been introduced. And when such a case occurs, relief will be granted by this court."

In the Liston and Prendible cases the State's evidence was considered "completely impeached," not because it was self-destructive

or opposed to physical facts, but because it was thought to have been overwhelmingly contradicted by witnesses. The same was true in State v: Francis, 199 Mo. 671, 688, 98. S. W., 11, 14, and State v. Primm, '98 Mo. 368, 372, 11 S. W. 732, 733, and to a considerable degree also in the Huff case. There can be no question about the fact that in these cases this court passed on the credibility of the testimony.

Two of the other cases cited in State v. Liston, supra, are State v. Packwood, 26 Mo. 340, 363, and State v. Mansfield, 41 Mo. 470, 473. The Packwood case says: "It is not the province of this court to weigh evidence, nor has it been the practice to interfere with that discretion which has been entrusted to circuit judges over the verdicts of juries. I am not aware, however, that the court has in any case entirely repudiated all power over the subject, although I believe the tendency of recent decisions has been in that direction." And it was declared in the Mansfield case: "Whilst the law is firmly established in this State that it is not the province of this court in civil cases to weigh the evidence or disturb the discretion of the lower courts in maintaining or setting aside verdicts, it is equally well settled that in criminal cases we have never abandoned our right to interfere where the record shows that manifest injustice has been committed, or the verdict is not supported by the evidence."

Another statement of the rule running back through perhaps a dozen cases to State v. Cook, 58 Mo. 546, 548, is found in State v. Caviness, 326 Mo. 992, 998, 33 S. W. (2d) 940, 943, and State v. Concelia, 250 Mo. 411, 424, 157 S. W. 778, 781, as follows: "Where there exists upon the record, what has been rather loosely called any 'substantial evidence' of the existence of a state of facts legally required to be shown, it is our duty to relegate the determination of controverted question to the triers of fact. 'The rule . . . . is that before this court will relieve on the ground that the verdict is not supported by the evidence, there must be either a total failure of evidence, or it must be so weak that the necessary inference is, that the verdict is the result of passion, prejudice or partiality.' " It will be noticed this quotation says there must be either a total failure of evidence, or it must be so *weak* as to raise a necessary inference that the verdict is the result of passion, prejudice or partiality. This concedes that this court will weigh the evidence to see whether it is weak, and from weakness will sometimes infer passion, prejudice or partiality.

Opposed to the cases cited above are scores of decisions (9 West's Mo. Dig., sec. 1159) holding our appellate courts will not weigh the evidence in a criminal case if the verdict and judgment below were supported by substantial evidence. The latest of these from this court are: State v. Harris, 337 Mo. 1052, 87 S. W. (2d) 1026, 1028 (3); State v. Short, 337 Mo. 1061, 87 S. W. (2d) 1031, 1033 (3); State v.

Mitchell (Mo. Div. 2), 86 S. W. (2d) 185, 186 (3); State v. Evans, 334 Mo. 914, 919, 68 S. W. (2d) 705, 708; State v. Simmons, 332 Mo. 247, 252, 58 S. W. (2d) 302, 303; State v. Scobee, 331 Mo. 217, 228, 53 S. W. (2d) 245, 250; State v. Creighton, 330 Mo. 1176, 1194, 52 S. W. (2d) 556, 562; State v. Gillman, 329 Mo. 306, 312, 44 S. W. (2d) 146, 148; State v. Decker, 326 Mo. 946, 961, 33 S. W. (2d) 958, 963; State v. Barnes, 325 Mo. 545, 551, 29 S. W. (2d) 156, 158; State v. Hedges (Mo. Div. 2), 295 S. W. 574, 576; State v. Henke, 313 Mo. 615, 627, 285 S. W. 392, 395; State v. Scheufler (Mo. Div. 2), 285 S. W. 419, 421; State v. Wagner, 312 Mo. 124, 129, 279 S. W. 30, 33.

In view of the supposed or apparent conflict between these cases and the foregoing decisions cited by appellant we shall re-examine the question presented, which is: will this court weigh the evidence in a criminal case and pass on the credibility of the witnesses, to determine whether the testimony for the State has been "completely impeached?" The Constitution guarantees the right of trial by jury [Secs. 22, 28, Art. 11]. And Section 3662, Revised Statutes 1929 (Mo. Stat. Ann., sec. 3662, p. 3216), requires that "all issues of fact in any criminal cause shall be tried by a jury." It is the function of the jury, not the court, to pass on the evidence in the first instance. But Section 3734, Revised Statutes 1929 (Mo. Stat. Ann., sec. 3734, p. 3272) provides, among other things, that the court may grant a new trial when "the verdict is contrary to the law or evidence." The expression therein "contrary to the evidence" is broad enough to permit the granting of a new trial because the verdict was against the weight of the evidence, State v. Harmon (Mo. Div. 2), 296 S. W. 391, 395 (10); and the statute refers, of course, to the trial court. But there is nothing in the Constitution or statutes forbidding this court or any other appellate court from exercising a like power on appeal.

Nevertheless it is well established that generally we *should* not interfere when the verdict below was supported by substantial evidence. [State v. Harmon, 296 S. W. 1. c. 395 (10).] This, as stated, is not because we lack jurisdiction in that behalf. It is because the trial court is in a better position to weigh the evidence accurately and to determine whether the jury performed their duty fairly and impartially. We do not see the witnesses and jurors, and observe their demeanor during the trial; we are not acquainted with the general trial atmosphere. [State v. Harmon, supra; Miles v. Haney, 190 Mo. App. 220, 225, 176 S. W. 429, 430.]

But we must in all cases scrutinize the record to see if the verdict was supported by *substantial* evidence. In this State the scintilla doctrine does not prevail. [Scrivner v. American Car & Foundry Co., 330 Mo. 408, 424, 50 S. W. (2d) 1001, 1006.] And what is substantial

evidence? Berkemeier v. Reller; 317 Mo. 614, 642, 296 S. W. 739, 752, says it is "evidence which, if true, would have probative force upon the issues." But it is more than that: even a scintilla of evidence must tend to prove the issue. It is so held in jurisdictions where the law requires a case to be submitted to the jury on a scintilla of evidence. [26 R. C. L., sec. 76, p. 1070; 23 C. J., sec. 1733, p. 9; 6 Words & Phrases (3 ser.), p. 971; 4 ibid (2 ser.), p. 483; L. & N. Railroad Co. v. Chambers, 165 Ky. 703, 706, 178 S. W. 1041, 1043; Ann. Cas. 1917B, 471, 472; Clark v. Youngs Exr., 146 Ky. 377, 142 S. W. 1032, 1035; Crosby v. Seaboard Air Line Ry., 81 S. C. 24, 31, 61 S. E. 1064; Sobolovitz v. Lubric Oil Co., 107 Ohio St. 204, 208, 104 N. E. 634, 635.]

To amount to more than a scintilla—that is, to be substantial—it has been said "the evidence must be of a character sufficiently substantial, in view of all the circumstances of the case, to warrant the jury, as triers of the facts, in finding from it the fact to establish which the evidence was introduced." [Holstein v. Benedict, 22 Haw. 441, 445, Ann. Cas. 1918B, 941, 943.] In other words, substantial evidence is evidence from which the triers of the fact reasonably could find the issue in harmony therewith.

This proposition has been stated in different ways. Thus in Offutt v. Columbian Exposition, 175 Ill. 472, 474-5, 51 N. E. 651, where the Illinois Supreme Court was confronted with certain former decisions holding that if there be any evidence tending to prove the plaintiff's case, it must be submitted to a jury, the court said: "Much confusion has doubtless arisen from the different meanings attached to the phrase 'tending to prove,' but giving it the meaning . . . that it is 'evidence upon which the jury could, without acting unreasonably in the eye of the law, decide in favor of the plaintiff or the party producing it,'—most of the apparent conflict between the different cases disappears."

So in Penna. Railroad Co. v. Chamberlain, 288 U. S. 333, 343, 53 Sup. Ct. 391, 77 L. Ed. 819, the U. S. Supreme Court said: "It repeatedly has been held by this court that before evidence may be left to the jury, 'there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.' "

Another Federal decision frequently quoted is Jenkins & Reynolds Co. v. Alpena Portland Cement Co., 147 Fed. 641, 643, where it was stated: "What constitutes such (substantial) evidence may be indicated in another way. If the evidence favoring such facts of the plaintiff's case is such that reasonable men may fairly differ as to whether it establishes them, then it is substantial," citing and quot-

ing from Grand Trunk Railroad Co. v. Ives, 144 U. S. 408, 417, 12 Sup. Ct. 679, 36 L. Ed. 485.

The rule in Missouri in civil causes is in harmony with the foregoing decisions. Thus in James v. K. C. Gas Co., 325 Mo. 1054, 1069, 30 S. W. (2d) 118, 123, this court en banc said: "Whether the evidence in a given case is sufficient to support the finding of the jury, when taken and considered in the fashion in which it must be on demurrer, depends on whether it is sufficient to establish with reasonable certainty in the minds of persons of ordinary and average intelligence the existence of the facts on which the finding is necessarily based." And in Hardin v. Ill. Cent. Railroad Co., 334 Mo. 1169, 1180, 70 S. W. (2d) 1075, 1079-80, Division One of this court said: "If reasonable minds could fairly and honestly have two views of the matter from all the evidence, then plaintiff's testimony was substantial evidence of his theory of the facts and it was for the jury to weigh it and determine which view to accept."

Now since the test of substantial evidence is whether a jury reasonably could find the issue thereon, the result must depend in some measure upon the degree of persuasion required. In a criminal case liberty and sometimes life are involved, and there cannot be a conviction except upon a finding of guilt beyond a reasonable doubt. Necessarily, therefore, it becomes the duty of an appellate court as a matter of law to decide whether the evidence was sufficient to induce a belief of the defendant's guilt beyond a reasonable doubt in the minds of jurors of average reason and intelligence. And in resolving that question the court undoubtedly can pass on the credibility of the testimony to the extent of determining whether it was substantial in the sense above explained. In no other way can the rights of the defendant be protected. It would be an incongruous situation if the court were compelled to let a conviction stand as being supported by evidence warranting a verdict of guilt beyond a reasonable doubt, when *for any reason* made manifest on the record the court is convinced the evidence reasonably could not support a conviction.

In so holding we are not to be understood as departing from the rule announced in the long line of recent cases cited above, that this court will not weigh the evidence in a criminal case if the verdict below was supported by substantial evidence. That rule presupposes there was evidence from which the jury reasonably *could* have returned a verdict of guilty. The same may be said of the rule laid down in State v. Gillman, 329 Mo. l. c. 312, 44 S. W. (2d) l. c. 148, that in passing upon the sufficiency of the evidence in a criminal case the court should take as true all *substantial* evidence offered by the State together with legitimate inferences to be drawn therefrom. And the statement in State v. Caviness, 326 Mo. l. c. 998, 33 S. W. (2d) l. c. 943—that this court will interfere when the evidence is so

weak as to raise a necessary inference that the verdict was the result of passion, prejudice or partiality—expresses the converse of the same proposition. For it is only another way of saying the verdict must have been based on something other than the evidence—in other words, that the evidence alone was not sufficient.

But granting the law in this State is as outlined above, the cases in which this court will set aside a conviction supported by evidence are rare. Where the State's evidence is inherently incredible, self-destructive or opposed to known physical facts, we are perhaps in as good a position to do so as the trial court. But where it is claimed the testimony is completely impeached by contradictory evidence, we are at a great disadvantage, since we lack the means to knowledge that come through confrontation. About all that can be said is that in such instances we reserve the power to grant relief when the denial of it would shock the sense of justice.

We do not feel constrained to interfere in this case. It is true the prosecuting witness Thompson and his wife both testified they recognized the appellant as one of the robbers at the time of the robbery, and yet admitted they did not so advise their neighbors who congregated soon afterward. Also they did not tell the sheriff who came the next day. Their explanation of this is not entirely satisfactory, but is possible. They contradicted the testimony of several of their neighbors, who swore that Mr. and Mrs. Thompson declared to them they did not know who the robbers were and could not identify them, except possibly "the big fellow." But we do not feel this justifies us in overturning the verdict. This assignment is ruled against the appellant.

II. The State put two witnesses on the stand, Dave Gayman and Roy Hamilton. Although admonished that they must answer questions, except such as the court should rule violative of their constitutional immunity against self-incrimination, both witnesses refused to answer any questions at all. Thereupon the prosecuting attorney had certain papers marked as exhibits, stating they were certified copies of files and records of the Circuit Court of New Madrid County in a criminal case wherein said two witnesses were defendants. He said these included the sentence and judgment of that court and the order fixing the date of execution, and then offered the exhibits in evidence to show the death sentence had been imposed upon Gayman and Hamilton in that case; and as a basis for cross-examining them because of their recalcitrance as State's witnesses in the instant case. All this was in the presence of the jury. Upon the appellant's objection that the exhibits were incompetent for any purpose the court excluded them, holding the witnesses were not adverse, since they had refused to testify at all, and that the State could not impeach them

because they were not adverse, citing State v. Bowen, 263. Mo. 279, 282, 172 S. W. 367, 368 and State v. Patton, 255 Mo. 245, 164 S. W. 223. The court announced, however, it would permit the prosecuting attorney to cross-examine the witnesses and ask them leading questions in an effort to refresh their memory.

Thereupon the prosecuting attorney called as a witness Mr. S. P. Hunter, a justice of the peace of New Madrid County, who testified he had presided at the preliminary hearing of the appellant in the instant cause; that the witnesses Gayman and Hamilton testified thereat; and that their testimony was taken in shorthand, transcribed, signed and sworn to by them after they had read the same. Mr. Hunter identified the signatures of both. While these facts were being elicited appellant's counsel objected repeatedly on the ground that the testimony was wholly immaterial, but the objections were overruled. However, after the foregoing facts had been proven, appellant's counsel moved that all Mr. Hunter's testimony relative to the preliminary examination be stricken and the jury instructed to disregard it. The court ruled as follows:

"BY THE COURT: His statement, or that part of his testimony identifying some signature of Dave Gayman *alias* Eddie and of Roy Hamilton may be disregarded, it may be material with him to show that was the testimony taken at the preliminary, is that what you want?

"MR. CONRAN: I want to show that this was the testimony they gave.

"MR. BRADLEY: The court sustained the objection so far as them signing that?

"BY THE COURT: Yes, sir, so far as it being their testimony is concerned."

As we understand the ruling of the court it was that the testimony of Mr. Hunter was competent to show the transcript referred to by the prosecuting attorney contained in general the testimony taken at the preliminary hearing, but that it could not be used to identify specifically the testimony given by Gayman and Hamilton thereat.

Thereupon the prosecuting attorney interrogated Mr. Hunter as to whether he heard Gayman and Hamilton testify at the preliminary hearing, and he said he did. He was then asked if the appellant's attorneys were present and cross-examined both witnesses and he answered in the affirmative as to one of them, Mr. Baynes. Objection was made by appellant's counsel to this line of examination on the ground that the State could not be allowed to lay a basis for reading the testimony taken at the preliminary and the court held the questions were asked only for the purpose of ascertaining whether Col. Baynes was present at the hearing and not for the purpose of using the transcript as evidence. To that appellant's counsel rejoined

that it was wholly immaterial whether Col. Baynes was present at the preliminary; and saved an exception. Following that, the State recalled Gayman to the stand and examined him as follows:

"Q. Now, then, Mr. Gayman, I want to ask you if you didn't testify at the preliminary hearing that you—I will ask you if Walter Gregory didn't tell you that he was out on ditch six when the hold-up of Fred Thompson took place:

"Mr. Bradley: We certainly object to that, it is leading and suggestive, and he is trying to get before the jury indirectly what he could not do directly, and this witness has already been on the stand and refuses to testify.

"By the Court: You didn't ask him anything about this, and you had better ask in the usual method, Mr. Conran. Forget that you are mad about anything and ask your questions, ask him just like he was any other witness, if he had a conversation with him.

"Q. How long have you known Walter Gregory? A. I refuse to answer.

"Q. I will ask you if you didn't have a conversation with Walter Gregory after September 7th, 1933? A. I refuse to answer.

"Q. And if in that conversation he didn't tell you—

"Mr. Bradley: We object to what anybody told him.

"By the Court: Overruled. (Exception saved.)

"Q. That he, Bill Schaffer, James Flowers and Chirp Riddy didn't go out on ditch six and hold up Mr. Thompson and steal the same identical pistol that is here, and then told you that the pistol was hot and the handles were taken off to get rid of the initials, and ask you if he didn't further tell you in that same conversation that they drove up in front of the store but didn't stop that there was a truck there unloading and said that they waited for the truck to get unloaded and then went back and asked for some gasoline, and that they got in trouble with the woman, and that they had to shoot at the man, didn't he tell you that?

"Mr. McKay: We certainly object to any stump speech, it is leading and suggestive and is not a question in cross-examination of any question asked by anyone.

"By the Court: He asked him if he didn't tell him so and so, of course the Court can't question the tone in which the question is asked. Overruled. (Exception saved.)

"A. I refuse to answer.

"Q. I will ask you another question, I will ask you if James Flowers didn't give you this pistol, give it to you when Walter Gregory was present, I will ask you if that didn't happen? A. I refuse to answer.

"Mr. Bradley: We make the same objection.

"By the Court: Overruled. (Exception saved.)

"Q. I will ask you if you didn't see Roy Hamilton put the tape on the handle of this pistol? A. I refuse to answer..

"MR. BRADLEY: Now if the Court please we move and request that the Court now instruct the jury that they will not consider the testimony and the questions asked this witness as any evidence against the defendant.

"BY THE COURT: The witness hasn't given any evidence, the Court will instruct in writing as he did in the other case if the instruction is requested, I can't repeat it *verbatim*, I will give that instruction if it is requested."

At appellant's request the court did later give an Instruction No. 8D, covering the foregoing cross-examination, as follows:

"The Court instructs the jury that all questions propounded by counsel for the State to the witnesses Gayman and Hamilton and the refusal of said witnesses to testify in the case is no evidence of the defendant's guilt in this case, and cannot be considered by you for any purpose in determining the guilt or innocence of the defendant on this charge."

When the prosecuting attorney offered in evidence, as stated above, certain records of another court showing Gayman and Hamilton were under sentence of death, the trial court ruled the State could not thus impeach its own recalcitrant witnesses, because they were not adverse since they had refused to testify at all. The court cited State v. Bowen, 263 Mo. 279, 282, 172 S. W. 367, 368, and State v. Patton, 255 Mo. 245, 258, 164 S. W. 223, 226. These decisions sustain that ruling. In the Bowen case it was decided that a party cannot impeach his own witness by proof of the witness's prior statements merely because the witness fails to testify to the facts as expected; that the witness must go further and testify in favor of the opposite party, producing a situation amounting to an entrapment, before he becomes adverse in such sense as to warrant his impeachment by the party producing him. This case is followed in State v. Drummins, 274 Mo. 632, 647, 204 S. W. 271, 275; State v. Hulbert, 299 Mo. 572, 575, 253 S. W. 764, 766; Deubler v. United Rys. Co., 195 Mo. App. 658, 669, 187 S. W. 813, 816; Randazzo v. United States, 300 Fed. 794, 797.

But after having so correctly ruled the learned trial court nevertheless permitted the State to proceed along a course which, it seems to us, had the effect of impeaching the two witnesses. For the prosecuting attorney next called to the stand Mr. Hunter, the justice of the peace at the preliminary hearing, and over appellant's objection proved by him that both witnesses testified at the preliminary; and that the transcript presented to him for identification contained their testimony given there and bore their true signatures. After all this had got into the record, on motion of appellant's counsel to strike out

Mr. Hunter's testimony the court apparently held that his testimony was competent to show the transcript contained in general the evidence taken at the preliminary hearing, but that it could not be shown the specific testimony of the two witnesses, Gayman and Hamilton was preserved therein. Then the prosecuting attorney further proved by Mr. Hunter that he heard Gayman and Hamilton testify at the preliminary and that one of appellant's lawyers, Mr. Baynes, was present and cross-examined them. We should have stated earlier, also, that when Gayman and Hamilton were first put on the stand and refused to answer questions, they were asked by the prosecuting attorney if they had been advised by Mr. McKay, one of appellant's counsel, not to testify.

All this was improper under the case cited by the trial court at the time, State v. Patton, 255 Mo. l. c. 258 et seq., 164 S. W. l. c. 226 et seq. It was there held that where an effort is made *to refresh the memory* of a forgetful or unwilling witness (and that is all that can be done where the witness is not adverse so as to permit impeachment) the former written statements of the witness may be exhibited to him for examination, but they cannot be read to the jury. And the case continues: "If necessary to prevent the contents of the paper shown to the witness from getting to the jury, the latter may be withdrawn while the witness is examining and identifying his testimony." The opinion goes on to say "If the witness deny his statements or refuse to identify the paper as a copy of what he said before, . . . the State is concluded and such paper may not be identified by another witness present. . . :" The Patton case has been followed in State v. Riles, 274 Mo. 618, 623, 204 S. W. 1, 2; State v. DePriest, 288 Mo. 459, 468, 232 S. W. 83, 86; State v. Henson, 290 Mo. 238, 245, 234 S. W. 832, 834.

Furthermore, following the examination of Justice HUNTER the prosecuting attorney recalled the witness Gayman to the stand and asked him if he did not testify at the preliminary hearing and then broke off the sentence and asked him if the appellant had not made certain admissions to him. Appellant's counsel objected that the prosecuting attorney's effort was to get before the jury indirectly what he could not do directly, since the witness was refusing to testify at all. The court admonished the prosecuting attorney to "forget that you are mad about anything and ask your questions;" and the prosecutor then asked two unimportant questions, which the witness refused to answer, and then in one long narrative question incorporated a number of different alleged damaging admissions made by the appellant to the witness acknowledging his guilt in detail.

We cannot escape the conclusion that prejudicial error was committed against the appellant. Although the court excluded the ex-

hibits mentioned above the prosecuting attorney actually got the fact before the jury that Gayman and Hamilton were under death sentence (and therefore unafraid of court discipline for their refusal to testify). That fact was referred to by the State's special counsel during the argument. The jury was made to know further that they testified at the preliminary and signed and swore to a transcript of their testimony; that Col. Baynes, one of appellant's counsel was present and cross-examined them. The transcript was produced in court in the presence of the jury. Then the prosecuting attorney recalled Gayman to the stand, and in an angry manner asked him questions calculated to give the jury the impression that the appellant had made damaging admissions to him (the witness) concerning which he had testified in the transcript. In our opinion the dramatization was carried too far; and the poisoning of the jurors' minds could not be cured by the subsequent withdrawal of a part of the evidence and the giving of Instruction No. 8D. [State v. Daubert, 42 Mo. 239, 246; State v. Thomas, 99 Mo. 235, 257, 12 S. W. 643, 650; State v. Webb, 254 Mo. 414, 434, 162 S. W. 622 628.]

If the doctrine of the Patton case is to be adhered to this was wrong; and we think the case is correct in principle. It is true the law is well settled that where evidence is competent for one purpose it cannot be excluded merely because it is incompetent and prejudicial for another purpose. But where by presenting the evidence in a particular manner a party can get all the benefits therefrom to which he is entitled without prejudicing the rights of the other party, he should not be permitted to make the showing in some other manner hurtful to his adversary. As the Patton case rules, the State cannot under the guise of refreshing the memory of its own witness (who is not adverse in a legal sense), prove to the jury that on a former occasion he testified to what he now declines to say; because the memory of the witness can be refreshed, if need be, out of the presence of the jury. State v. Shepard, 334 Mo. 423, 430, 67 S. W. (2d) 91, 95, seems to hold to the contrary. The writer hereof was the author of that opinion. In that case the appellant filed no brief and the attention of the court was not called to the Patton decision and the cases following it. The Shepard case is overruled so far as it conflicts with the Patton case.

The appellant's brief directs our attention to State v. Hamilton, 337 Mo. 460, 85 S. W. (2d) 35, wherefrom it appears that the conviction of the recalcitrant witnesses Hamilton and Gayman and the infliction of the death sentence upon them was upon a plea of guilty to murder in the first degree; and that the conviction was affirmed. If the sentence was executed and these witnesses are now deceased, it may be the transcript of their testimony taken at the preliminary hearing will be competent on a retrial of this case (though we are not,

of course, passing on that question) under such cases as State v. Pierson, 337 Mo. 475, 85 S. W. (2d) 48, 53 (5); State v. Bradford, 324 Mo. 695, 700, 24 S. W. (2d) 993, 994; State v. Harp, 320 Mo. 1, 6, 6 S. W. (2d) 562, 563. Neither are we holding one way or the other on the question whether the refusal of a witness to testify through the procurement of a party would be legally equivalent to the death or absence of the witness and would make competent against such party a transcript of the witness's testimony at a former proceeding in the same case.

We have examined the numerous other assignments in appellant's brief and in view of the conclusion reached on the points already considered, we deem it unnecessary to discuss them in this opinion. Some eleven of these assignments complain of error in the giving and refusal of instructions. We find no prejudicial error in the court's ruling on the instructions. The other errors complained of probably will not occur on a retrial of the cause.

For the reasons stated in paragraph II of this opinion the judgment is reversed and the cause remanded for a new trial. All concur.