**STATE of Missouri, Respondent,**

v.

**Wesley Berrie AUSTIN, Appellant.**

**No. 56966.**

Supreme Court of Missouri,
En Banc.

June 19, 1973.

————◆————

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Benjamin Roth, St. Louis, for appellant.

HIGGINS, Commissioner.

Wesley Berrie Austin, with prior felony conviction, was convicted by a jury of assault with intent to kill with malice, and the court assessed his punishment at 25 years' imprisonment. Sentence and judgment were rendered accordingly. §§ 556.-280, 559.180, V.A.M.S. (Appeal taken prior to January 1, 1972.)

On August 20, 1970, James Schultz was a St. Louis police officer with nearly fourteen years' experience. At about 1:30 p.m. that date, he heard a broadcast of a description of an automobile and two occupants wanted for an offense. At Newstead and Olive Streets he noticed an automobile resembling the described automobile and followed it south for three-and-a-half blocks on Newstead. The pursued vehicle violated a stop sign at McPherson after which he sounded his siren. The driver, a woman, stopped the car at the west curb in the 300 block of Newstead. Officer Schultz stopped above five or six feet behind and a little to the left of the stopped

vehicle as per police custom. The man seated in the right rear opened the door and started to get out. "I told him to get back in the car and 'put your hands in the back of the front seat where I can see them and tell your partner to do the same thing.' * * * There was another Negro male in the rear seat of the left side of this automobile." Officer Schultz could see the face of the first man. "He was standing right by the rear door with his left arm on top of the door, it was in an open position and he was turned facing me, and that's when he said, 'But, Officer, what did we do?'" The man did not comply. "* * * I glanced over at the second man to see what he was doing and I looked back at the man I was talking to, and his arm was resting on top of the vehicle and he had a .38 caliber revolver in it, and he shot me." He could see the man's face when he saw the gun. "He was aiming it right between my eyes. * * * The bullet hit me in the face and threw me up against the car." He heard a second bullet fired but did not feel it.

Officer Schultz was taken first to City Hospital No. 1 and then to Deaconess Hospital where he was confined for four weeks. While in the hospital, he viewed four lineups, the last of which was conducted September 2, 1970. There were four men in that lineup and he identified number three, Wesley Berrie Austin, as the subject who shot him. "I recognized his face, his facial features I'll never forget." Officer Schultz also identified defendant in court as his assailant. There was no question about his identification.

Prior to this incident, in 1967, Officer Schultz had arrested Leslie Delano Austin, identical twin brother of Wesley Berrie Austin. On August 27, 1970, Officer Schultz told Detective Thomilson he thought Leslie Austin could have been the man who shot him.

On cross-examination, Officer Schultz further described his assailant as having a little chin whiskers or goatee and a slight

mustache. These items were omitted from a police report made by another officer but were corroborated by the photograph of the lineup containing Wesley Berrie Austin. He described his assailant on August 28, 1970, as "in his twenties, he was a Negro male, he was dark skinned, he had a medium natural, he had a small goatee, he was about five foot ten to six foot tall, he weighed about 150 pounds, and he was wearing dark clothes."

Further cross-examination disclosed that the driver of the automobile "reminded" him of Janie Griffin, a person he had arrested in 1967. He was further reminded that Leslie Austin was one of her associates at that time. He asked to see a picture in his personal files of Leslie Austin. Sergeant Matthews brought such a picture and "I said I believe this could be the man that shot me, I'd have to see him in person."

Elizabeth Pross and Carole Bentzinger were together at 336 North Newstead at the time of the shooting. Elizabeth heard the siren, saw the two vehicles, observed them stop, and saw Officer Schultz get out of the pursuing vehicle. In her version, two persons got out of the pursued vehicle, one from the back and one from the front. The detective "pulled his gun and the other two got out and they had a gun." She heard two gunshots after which the two suspects ran south to Maryland and west on Maryland. Officer Schultz had one shot in his face and one in his neck. She described the suspects as "both wearing dark trousers, * * * dark shirts, * * * they had semi-Afro types for hair styles, they were short like, they weren't shortly cropped and they weren't amazingly long, they were about an inch or inch and a half. As for height, I would say, give one or two inches, to six feet, either way. * * * They were young * * * late teens or very early twenties." Elizabeth was unable to identify any person as one of the suspects in three lineups which she viewed.

Carole Bentzinger saw three men outside the vehicles stopped at Newstead. She heard two shots and saw two men run around the corner at Newstead and Maryland. She was unable to judge the ages of the fleeing men. She remembered their hair as "sort of a halfway grown Afro." They were wearing dark clothing and "were pretty tall." She, too, was unable to identify anyone by lineup.

Earl Bolin, a maintenance man at 316 North Newstead, heard two shots. He saw the lead car and "this girl was trying to close the back left-hand door, right-hand door of the car, she leaned back across the seat. * * * I saw two buys running down the street on the other side, looking back * * *." They were wearing "dark clothing." He, too, was unable to identify anyone as being an assailant of Officer Schultz.

Detective Robert Downey rode in the ambulance which took Officer Schultz to the hospital. He also visited Officer Schultz on Sunday, August 30, 1970, at which time "He showed me a photograph of a subject and indicated to me that the subject was the closest subject that he could recollect that shot him." Officer Schultz stated the party should be in the penitentiary, and a number on the picture identified it as a photograph of Leslie Austin. He reported this to his superior, Sgt. James Matthews.

Officer William Anderson was called at 3:30 p. m., August 20, 1970, by Sergeant Matthews, and assigned to investigation of the shooting of Officer Schultz. On September 1, 1970, he was working with Detective Frank Baricevic and they went to 4245 Aldine looking for Leslie Austin. They talked to an elderly lady who identified herself as Mrs. Austin and advised them that Leslie was in the penitentiary. After this conversation, they went to the street and looked over an old Cadillac automobile parked in front of 4245 Aldine. A subject came from the house and identi-

fied himself as Wesley Austin, the same person as the defendant at trial. The officers took him to the police station, released him, and took him into custody again September 2, 1970. On this second occasion, they took Wesley Austin to Deaconess Hospital and placed him in a lineup with three other men. The four walked into Officer Schultz's hospital room and faced Officer Schultz. He pointed his finger at Wesley Austin and stated that he was his assailant. There was no hesitancy on his part.

Det. Sgt. Philip Dwyer assisted with the lineup at Deaconess Hospital September 2, 1970. The lineup contained Wesley Berrie Austin and three other subjects. He was aware that the police report omitted any reference to facial hair on the suspect but recalled that Officer Schultz described his assailant as "five foot ten to six foot, he had a mustache and goatee and possible sideburns."

Det. Larry Devries worked under Sergeant Dwyer and took the statement from Officer Schultz. He noted the omission of any reference to facial hair on the assailant in the official report, but testified from his original notes that Officer Schultz had stated "possible goatee and a mustache."

Dr. James F. Cooper attended Officer Schultz beginning August 20, 1970. "He had two gunshot wounds." Both were entrance wounds, one in the face, the other in the neck. There were no exits. He removed the bullets from both entrances and gave them to the police.

Det. Paul Reeder examined the bullets taken from Officer Schultz's face and neck wounds and identified them as .38 caliber specials which came from a single weapon. He had fired all of the .38 special revolvers from which the bullets could conceivably have been fired and never found the gun that fired the bullets.

In addition to the strenuous and detailed cross-examination of the foregoing wit-

nesses for the State, the defense further consisted of testimony from defendant, his girl friend, his mother, and a friend.

Wesley Austin stated his twin brother, Leslie, was in the penitentiary and that they did not look alike. He stated he was working on his car on August 20, 1970. He described the lineup at the hospital and, upon being identified by Officer Schultz as his assailant, "I told him that he was wrong, to take another look at me."

Delores Terrell, defendant's girl friend and mother of a child by him, stated he had never in her three years' acquaintance worn long sideburns but had worn a beard and mustache such as he wore at time of trial. She described Wesley's twin brother, Leslie, as "much thinner, he's real thin, he's taller and he's clean shaven. When I saw him he didn't have a goatee or mustache or anything, and he doesn't look like Wesley. * * * Leslie is much lighter than Wesley." She was present at 4245 Aldine when the two officers came looking for Leslie and took Wesley with them. She was also present when they came for him the second time the following day, September 2, 1970. The next day was the first she knew he was being held for the shooting charge.

On cross-examination, she stated she had no personal knowledge of what Wesley Austin was doing on August 20, 1970. She was also cross-examined with respect to her direct testimony that she had not known Leslie Austin to wear chin whiskers or a mustache. She was then shown Exhibit 16 which she stated "looks like a picture of Wesley's brother," Leslie Austin. With respect to facial hair, she stated the exhibit showed Leslie to have a mustache and some chin whiskers. She then conceded that at some time Leslie had a mustache and some whiskers.

Pearlean Austin is the mother of Leslie and Wesley Austin. According to her, the twin sons did not look alike. "Leslie is tall and thin, he's light complected." She advised the officers when they came looking

for Leslie that he was in the penitentiary. After they left, Wesley went to the street where the officers were looking at his car. She learned he was charged with this crime when the officers came for him the second time.

Jack Thomas had not known Wesley Austin to wear long sideburns and he had a reputation of being nonviolent.

Appellant contends the court erred in failing to sustain his motions for directed verdict "since the evidence was not sufficient to induce a belief of guilt beyond a reasonable doubt."

In support of his contention, appellant asserts six items which he characterizes as "doubt raising matters": 1. Detective Schultz's memory was clearly erroneous as witness his momentary distraction by the other occupant of the car; three other witnesses were unable to identify the assailant. 2. Schultz's view of Wesley Austin was unreliable by virtue of the picture of Leslie Austin and Wesley's dress causing him to stick out prominently. 3. Identification of Wesley because of eyes and jawline when the real feature was presence of goatee. 4. Accounts of Wesley's behavior as completely out of character with guilt. 5. No corroboration. 6. Lack of alibi.

Citing State v. Gregory, 339 Mo. 133, 96 S.W.2d 47, 52[5, 6], that it is the duty of an appellate court as a matter of law to decide whether the evidence was sufficient to induce a belief of guilt beyond a reasonable doubt, appellant argues that in context of his six points, "it is impossible to believe that any person of average reason and intelligence would find * * * that reasonable doubt of Wesley Austin's guilt was eliminated by so shaky an identification."

■ In asserting this contention, appellant concedes that "it is clear that Detective Schultz' testimony that he recognized the Defendant as the man who shot him is some evidence against the Defendant." It may be added that Detective Schultz testi-fied that, without question, Wesley Austin was the man who shot him, and there was a face-to-face confrontation of victim and assailant at the time of the shooting. Such is substantial evidence of defendant's guilt of the charge. State v. Whitaker, Mo., 275 S.W.2d 316, 319[10, 11]; State v. Gregory, supra. Contrary to appellant's assertion, the court refused to weigh evidence in State v. Gregory, supra, 339 Mo. 133, 96 S.W.2d l.c. 52–53[5, 6], and held that the appellate court will not weigh evidence if the verdict was supported by substantial evidence. Defects and inconsistencies, if any, in the testimony of Officer Schultz when considered with all the evidence were for the jury to resolve and the jury could properly resolve such conflicts against defendant.

Appellant contends the court erred in admitting Exhibit 16, the picture of Leslie Austin, because it was irrelevant and prejudicial and was not properly identified.

■ The exhibit in question was submitted as a likeness of Leslie Austin and was so identified by Miss Terrell. Accordingly, its admission was not erroneous for any failure to properly identify it.

■ The crux of this case is the identification of Wesley Austin as the assailant by his victim, Officer Schultz. The defense attacked the accuracy of such identification; and, in the course of such attack, Leslie Austin's appearance as to facial hair became an issue, particularly in the testimony of Miss Terrell. Admission of the photograph to rebut her testimony to effect Leslie and Wesley did not look alike, was relevant to the issue, State v. Fingers, Mo., 357 S.W.2d 89; State v. Holt, Mo., 465 S.W.2d 602, and well within the discretion accorded a trial court in admission of photographs. State v. Sims, Mo., 395 S.W.2d 445, 449.

Appellant complains, on the premise of the dissent in State v. Cannon, Mo., 465 S.W.2d 584, 588–589, that he should have been allowed to examine police reports

made before Officer Schultz saw defendant to determine whether he had made prior statements inconsistent with his identification.

State v. Cannon, supra, held that the defendant was not prejudiced by the failure to order production of reports in question because they would be merely informational and inadmissible in evidence. The same situation exists here. The report sought was not written by Officer Schultz and, as to him, is hearsay and not admissible for his impeachment. State v. Williams, Mo., 473 S.W.2d 388, 390[3]. The report was shown to be erroneous and the officers involved in its preparation testified to the true description given them by Officer Schultz, and testimony of the description given by Officer Schultz and by the transcriber, Sgt. Dwyer, is the best evidence of the description. In such circumstances, failure to order production of the report sought did not render defendant's trial "fundamentally unfair." State v. Aubuchon, Mo., 381 S.W.2d 807, 814.

During cross-examination of Officer Schultz, defendant offered to prove that Officer Schultz "went to identify and did identify Janie Griffin as the woman who was driving the car * * * and that subsequently and without a preliminary hearing Janie Griffin has been released on the basis of a nolle pros sequi * * *." During the examination of defendant, defendant offered to prove that Janie Griffin was in Chicago on the date in question. Appellant assigns error to the refusal of such offers.

State v. Chamineak, Mo., 343 S.W.2d 153, held that an acquittal of a defendant in a connected case was not relative to the case on trial and was properly excluded. By analogy the nolle prosequi of a third party's case would be properly excluded also.

With respect to the second offer, neither the actions of Janie Griffin nor her tentative identification by Officer Schultz were relevant to the issue of defendant's guilt. Consequently, there was no abuse of discretion in excluding such from evidence.

Appellant's final complaint is that the court erred in overruling defendant's motion that the jury be instructed to disregard evidence of Officer Schultz's identification of defendant in the lineup conducted at the hospital.

In presentation of this complaint appellant does not contend that the in-court identification was incompetent "since it could well be based upon recollection, independent of the identification in the suggestive line-up." See State v. Hamblin, Mo., 448 S.W.2d 603.

Appellant would support his charge with United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199; however, those authorities do not apply to preindictment lineups such as the one conducted here. State v. Walters, Mo., 457 S.W.2d 817; Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411.

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the Court En Banc.

FINCH, C. J., and DONNELLY, MORGAN, HOLMAN, BARDGETT and HENLEY, JJ., concur.

SEILER, J., dissents in separate dissenting opinion filed.

SEILER, Judge (dissenting).

I respectfully dissent, on the ground it was prejudicial error to admit exhibit 16, the police mug shot of Leslie, showing

him with a beard and moustache, as part of the cross-examination of Miss Terrell.

Throughout the case, defendant was maintaining he was a victim of mistaken identification. Detective Schultz had originally selected a 1967 or earlier police photograph of Leslie as the man who shot him. This photograph was exhibit 2 and shows Leslie clean shaven. Then Detective Schultz shifted to identification of defendant (Wesley) as the man, but defendant had a moustache and a goatee. Miss Terrell, who knew both Leslie and Wesley, testified the brothers were dissimilar in appearance. One feature she mentioned was that Leslie was clean shaven, while Wesley had a beard and moustache. *She had not seen Leslie since 1969.*

In this setting, and for the purpose of showing Miss Terrell "doesn't know what she is talking about", the state, over objection, put in evidence exhibit 16, a *1970* police mug shot of Leslie, showing him with a beard and moustache, after Miss Terrell said it was a picture of Leslie. The error lies in the fact that exhibit 16 did not go to rebut or contradict Miss Terrell's testimony that Leslie was clean shaven, when she knew him, because the exhibit portrayed Leslie's appearance at a time subsequent to when Miss Terrell last saw him. The fact Leslie had a beard and moustache in 1970 does not contradict her testimony that when she last saw him a year or so before, and all times prior, Leslie was clean shaven as contrasted to Wesley, who had a beard and moustache. I submit the principal opinion is in error in holding exhibit 16 is relevant to the issue.

It is as though in an ordinary damage suit growing out of an intersection collision one issue was whether there was a stop sign at the intersection. Assume a witness testified there was no stop sign at the intersection. It would not be permissible to confront this witness with a photograph showing the intersection with a stop sign subsequently erected, and then, simply by obtaining the answer of the

witness that this was the location of the accident, admit the photograph in evidence to rebut the witness' testimony there was no stop sign at the intersection when the collision occurred. It would be inadmissible because it would have nothing to do with rebutting the testimony that there was no stop sign at the intersection at the time of the collision. The necessary foundation would not have been laid.

The purpose of the state in offering exhibit 16 was to show that Miss Terrell did not know what she was talking about. The jury was led to believe exhibit 16 was a contradiction of her earlier testimony that Leslie was clean shaven, this being one of the asserted differences in appearance between the two brothers. No foundation was established for such contradictory inference to be drawn from exhibit 16. The trial court should have sustained defendant's objections and excluded exhibit 16.

On the issue of whether this error was prejudicial, the question of guilt or innocence is far too close in this case for us to disregard the error in admitting exhibit 16. Three disinterested eyewitnesses were unable to identify Wesley as the man involved. There were no corroborating witnesses, no confession, no admissions, no weapon, no fingerprints, no suspicious loot, no license numbers traced. The identification by Detective Schultz was the sole evidence of guilt. It is a "one versus one situation". Defendant's demeanor showed no guilt, in fact the contrary. When the detectives came to the house looking for Leslie, they were not even aware of Wesley. Wesley overheard their conversation and voluntarily came outside to the parked car the detectives were checking. The detectives then took him to be viewed by Schultz, but Schultz was not up to it, so they released Wesley without charge. Then next morning they went back to Wesley's mother's house and Wesley was still there. These are not the actions of a guilty man, particularly one who has shot a policeman.

I realize the issue of identification was one of fact for the jury, but this is one reason why we have rules of evidence to be followed as to what is put before the jury. This was a close case, and if the jury could be convinced that both Leslie and Wesley wore beards and moustaches, it would be easier for the jury to believe that while detective Schultz at first selected as a photograph of his assailant a subject who could not have committed the crime because he was in the penitentiary, he was correct when he later identified defendant Wesley, the twin brother, as the man. Exhibit 16, an official police photograph, helped the state convince the jury that Miss Terrell, a principal witness for defendant, falsified or was mistaken when she said Wesley bore a beard and moustache, but Leslie had not. In my opinion, we cannot declare as a matter of law that the admission of exhibit 16 was harmless error, see the principal opinion by Bardgett, J. and the concurring opinion by Finch, C. J. in State v. Degraffenreid, 477 S.W.2d 57 (Mo. banc, 1972). I would reverse and remand for a new trial.