**STATE of Missouri, Respondent,**

v.

**Frank P. SIRAGUSO, Appellant.**

**No. WD 30893.**

Missouri Court of Appeals,
Western District.

Dec. 2, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 30, 1980.

Application to Transfer Denied
Jan. 9, 1981.

Lewis E. Pierce, William E. Shull, Gettig, Coulson & Shull, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Steven W. Garrett, Asst. Atty. Gen., Jefferson City, for respondent.

Before TURNAGE, P. J., and SHANGLER and MANFORD, JJ.

SHANGLER, Judge.

The defendant Siraguso was convicted of the arson of a dwelling house and sentenced to imprisonment for two years. The appeal contends among other grounds that the evidence was not sufficient to submit the offense to the jury. We agree.

The evidence taken most favorably to the judgment of conviction shows: the residence was owned by one Lorraine Kamler who occupied the premises with two teenage daughters. The house burned on June 9, 1978. At the time of the fire, she and the girls were at the home of another daughter. They left the residence several days before, out of fear. The home was burglarized on June 2, 1978, the contents ransacked, and black marks and red numbers were smirched on the bedroom doors—as well as other symbols which intimated the vandals would return to molest them. [on one bedroom door, a daughter found a note: "We missed you this time, little Dago lover, but we'll be back."] On about that date, Ms. Kamler received a telephone call: "You don't scare easy, do you?" When demanded his identity, the caller said only, "Get out." This episode was only the culmination of tragedies which attended occupancy of that house. In February of 1977 she was raped there, her husband left her thereafter, and the mother and daughters began to be harassed by threats and obscene telephone calls. A voyeur was seen around the windows and the peeper was finally apprehended by the aid of a neighbor. The burglary and smirches of the home on June 2, 1978, so terrified the daughters that they refused to remain there any longer. Thus, on June 5, 1978, mother and daughters left with intention to return later.

Ms. Kamler entrusted the key to the residence to the defendant Siraguso, a young man of twenty-one years. The defendant had known the Kamlers for some ten years—in fact, they were distant relatives. There was no qualm about entrustment of the premises to Siraguso and Ms. Kamler gave him the key. [She had asked the police to look after the home as she had reported every other incident of harassment and lawlessness but was told the department could not keep a twenty-four hour watch.] Ms. Kamler informed one Thompson, a neighbor on the other side of the street [and her insurance agent], of her departure from fright and of her destination. Ms. Kamler visited the home on each day, June 6th, 7th and 8th, and found everything in order.

The defendant Siraguso entered the Kamler residence near midnight on June 8, 1978. He was accompanied by one Spino. They used the key to unlock the door for entry. Once inside, they looked around the

upper floor—but not the basement—and found the house "a mess." The bedroom doors were smeared with red and black paint and the screened porches were slit. The two young men turned on the television set for the baseball game. In a short time, the police arrived in response to a prowler call. [They were summoned by neighbor Thompson who was distracted from his own engrossment in the baseball game by the sound of broken glass and the sight of a van backed up into the Kamler garage.] The police asked Siraguso and Spino to explain their presence. The defendant related that they were there to watch over the premises by request of the owner, and explained the harassments which prompted her departure. The defendant displayed identification and demonstrated that the key given him opened the front door. The defendant attempted to reach Ms. Kamler by telephone to corroborate the narrative, but without success. The officers spent some twenty minutes on the premises. They perused the first floor and garage, but not the basement. They obtained the license number of the van in the garage the two men used for transportation. One of the officers, McCoy, detected some odor, but was not able to identify it because an allergy then interfered with his olfactory perception. The officers were satisfied the two men were on the premises legitimately, and so departed.

The officers left at about five minutes to one o'clock on the morning of June 9th. Within minutes of the police departure, neighbor Thompson heard two "puffs" from across the street and saw flames shoot out of the basement window wells. Thompson ran across the street just as Siraguso and Spino pulled out of the driveway in the van. He heard them say: "Let's get out of here." Thompson pounded on the vehicle and said: "Where are you going?", to which there was no reply. He then said: "Say, there's a fire," to which they replied: "Yes, we know and we're getting out of here." The van accelerated away. The defendant Siraguso explained that, as they sat there, there was a sound of explosion accompanied by black smoke. They surmised that the locus was in the basement but could not enter because of the fumes. By that time smoke so enveloped the entire house that the telephone was no longer accessible nor the area bearable. They jumped into the van to drive away, and as they did, they confronted Thompson who asked what was wrong. They told him of the fire—although that condition was obvious—and asked him to telephone the fire and police departments. The two men were stopped by police at the lot used to park Double S Vending vehicles, some distance away. The defendant Siraguso was employed by Double S to service cigarette machines and collect the coins. The van was used in that occupation. Siraguso was allowed personal use of the vehicle freely, according to the employer. The employer was aware also that Siraguso mowed lawns for additional earnings and probably used the van to transport that machine as well.

The officers who intercepted the van immediately after the fire detected an odor of gasoline from the van. Officer Whorton testified to "a puddle of gasoline" on the floor mat between the two front seats.[1] A segment of the mat was preserved and laboratory analysis determined that the material was impregnated with gasoline. The employer Walton explained that a gasoline container was often carried in the front area of the van as a precaution against an empty tank. That was because the driver often had in custody sums of money from the machines and the practice to carry additional gasoline was to avoid the need to leave the vehicle unattended during a search for fuel. The officers also took into custody the clothes and shoes of defendant Siraguso for examination. The laboratory analysis reported there was no trace of gasoline or gasoline fumes on the apparel.

The cause of the fire was from the ignition by a hot water heater of clothes soaked

1. That testimony was from memory of the events. Whorton acknowledged that his official report made no mention of a "puddle."

with gasoline. The garments, according to Fire Investigator McKiddy, were saturated with the fluid and then placed between the furnace and heater. In due time, as the vapors rose from the basement floor, they were ignited by the pilot light of the hot water heater, and the fire thence spread onto the first floor through the heat duct. The heat caused cans of flammable insecticide to explode, so that the firemen confronted not only the flames and smoke, but also toxic vapors. Inspection of the premises disclosed a five gallon gasoline can in the garage which emitted the fluid odors. Laboratory examination disclosed that the fluid was gasoline. There was no attempt to test the container for fingerprints, however. The witness Distasio testified that he mowed the lawn for Ms. Kamler, the last time about a week before the fire, and recalled a five gallon gas container in the garage. He used his own fuel, however, since the can contained a gas and oil mixture unsuitable to the mower.

■ The arson of a dwelling house within [then] §§ 560.010 and 560.015, RSMo 1969, requires proof of two elements beyond a reasonable doubt: (1) that the accused set fire to the structure, and (2) that the accused did so intentionally. MAI–CR 7.02. The conviction, therefore, must rest on evidence that the accused was an agent of the crime. A conviction must rest on something more than guess, or suspicion, or even probability of guilt. There must be evidence that the accused affirmatively participated in the criminal venture, or consciously shared or associated in the act. *State v. Miller*, 536 S.W.2d 524, 527[3–5] (Mo.App. 1976). When the facts of the crime are proved by circumstantial evidence, the concatenation of circumstances the prosecution asserts for guilt must be consistent with the hypothesis of guilt, and must be inconsistent with innocence, and exclude every reasonable hypothesis that the accused was innocent. *State v. Franco*, 544 S.W.2d 533, 534[2] (Mo. banc 1976). It is for the prosecution to forge every connection in the chain of proof, and not the duty of the accused to break the sequence of the circumstantial evidence to be entitled to ac-

quittal. *State v. Irby*, 423 S.W.2d 800, 802[1] (Mo.1968). In this assessment of the proof, evidence that the accused was present at the scene and had opportunity to commit the crime does not suffice as circumstantial evidence of guilt. *State v. Morse*, 515 S.W.2d 608, 610[2–6] (Mo.App. 1974). Nor does flight alone suffice as a circumstance for conviction where the accused has a reasonable explanation consistent with a hypothesis other than that of consciousness of guilt. *State v. Castaldi*, 386 S.W.2d 392, 395[4, 5] (Mo.1965).

■ The evidence placed the defendant Siraguso and companion Spino at the scene of the fire [although not in the basement where the arson was committed], showed his quick flight and disclosed that the van he and the companion occupied gave off some redolence of gasoline and yielded traces of the fluid from the floor mat. None of these circumstances, alone or combined, is inconsistent with the innocence of the defendant.

The evidence was undoubted that the defendant Siraguso was on the premises legitimately. They were entrusted to his protection by the owner. The defendant and companion arrived—from the best inferences—close to midnight, and within a half-hour, the police came in response from a prowler call from neighbor Thompson. The police left after twenty minutes [about 12:55 a. m.] and within minutes, the fire was detected. The fire, according to prosecution expert McKiddy, was ignited by contact between vapors from the soaked garments on the basement floor and the hot water heater pilot light. The combustion, according to the expert testimony, was not instantaneous but when, in due course, the vapors exuded from the garments and rose to the flame. The evidence raises clear inference that the process of combustion was of a duration beyond the presence of the defendant on the premises that night. Nor was there any evidence that Siraguso was there recently outside the presence of the owner. The opportunity for Siraguso to perform the arson was shown, but that op-

**342**

portunity was not exclusive. The evidence was clear that the screens to the premises windows were slit so that a person could gain entry without a key. The recent breaks into the home, the vandalism, threats, peep episodes, rape and other ravages, show that others had not only opportunity, but purpose to further destroy the Kamler property, even by fire. These circumstances are as consistent with the innocence of the defendant Siraguso as with his guilt, and thus, *do not exclude every reasonable hypothesis of innocence. State v. Eye*, 492 S.W.2d 166, 168[2] (Mo.App.1973).

The evidence implies that the fire combusted during the interval between the departure of the police and the signs of flame and smoke only minutes later. The defendant had exclusive access to the premises for that purpose from arrival at the house somewhat before midnight. The police came thirty minutes later and remained for twenty minutes or so. [The time of arrival of defendant is established credibly other than the Siraguso testimony by the narrative of prosecution witness Thompson, the neighbor across the street, who was made alert to the entry by the noise of the van into the garage.] If speculation were permissible to assume that Siraguso brought fuel [the source of which was never determined—whether from the container in the garage or as part of the specimen recovered from the car floor mat] and then soaked garments with gasoline and then placed them between the furnace and hot water heater for combustion in due time, we would need to assume further that despite the criminal nature of the enterprise, the· defendant conducted the venture openly, because:

the defendant entered through the front door and placed the van visibly in the open garage,

the defendant remained on the premises despite the known hazard of fire, with the house. lights on to view a television broadcast of a baseball game,

made no effort to remove the incendiary material, then not yet combusted, after the police came and learned his identity and the license number of the van,

the defendant parked the van in the garage in open view and in a place vulnerable to any fire of the residence, so as to impede any quick exit.

If speculation were, on the other hand, that the fire was set *after* the police left, we need assume that the criminal act was undertaken despite the recent arrival of the police and disclosure of identity. Even that speculation would contradict the expert evidence that the combustion was the result of a process [2] rather than of an immediate ignition. Even more, these assumptions are contradicted by the physical fact that no trace of gasoline fuel or fume was found on the clothes of defendant Siraguso, are otherwise impaired by the want of evidence as to the source of the fuel.

■ There remains the circumstance of the flight of the defendant from the fire scene. Flight from the scene of a crime connotes guilt, *but only where there is other evidence of the commission of a crime. State v. Thompson*, 363 S.W.2d 711, 714[3] (Mo. banc 1963). Flight from a fire or other danger out of human fear, however, is conduct consistent with innocence. *State v.*

---

**2.** The narrative of prosecution fire expert McKiddy describes the location, cause and origin of the fire:

"Basically our investigation entailed an examination of at first going to the most fire damaged area which was confined to the northwest corner of the basement in the residence . . . [I]mmediately to the south of that there were all kinds of clothes scattered on the floor . . . there was a large quantity of clothes there that this aroma that was similar to gasoline was coming from. In this area from the west wall over to the location *approximately 10 feet away of where the hot*

*water heater and the gas furnace were these clothes were scattered about."* [Tr. 86, 87] *"This hot water heater we believe this to be the source of ignition. The flammable liquid vapors that had associated occurred in the basement and built up until it reached a level of fumes, gasoline is a highly flammable liquid and it's heavier than air and it tends to settle to the floor. And as they rise up they seek a source of ignition. And we believe the hot water heater to be the source of ignition for this particular fire."* [Tr. 80] [emphases added]

*Castaldi, supra,* l. c. 395[4, 5]; Wharton's Criminal Evidence, § 214 (13th ed.). The defendant gave the explanation that he had attempted to reach the telephone to notify the authorities about the fire but that the black smoke and fire prevented that and made longer stay precarious. In his words: "I had to get the van out of the garage for one thing because the house was on fire. And we was, like I said, more or less panicked and coughing." It was the testimony of defendant that as they left in the van, they shouted to Thompson, by then come from across the street, that there was a fire and to call the fire and police departments. The witness Thompson confirmed that exclamation by the defendant in the report to the police. The flight of the defendant from a house aflame and asmoke was an event consistent with innocence, and so not a valid component of circumstantial proof of guilt.

 The evidence raises suspicion of guilt, but to prove a conviction, there must be *some evidence* to associate the defendant directly to the commission of the crime of which he is accused. *State v. Eye, supra,* l. c. 168[3, 4], *State v. Lane,* 497 S.W.2d 207, 209[1, 2] (Mo.App.1973). The evidence taken most favorably to the prosecution does not prove a willful act of the defendant to set fire to the dwelling. The incendiary origin of a fire and the guilty agency of an accused may be shown by circumstantial evidence.[3] In this case, the circumstantial

---

**3.** The standard of appellate review of a criminal conviction enunciated, and last reaffirmed, by the Missouri Supreme Court en banc is that the elements of the offense be supported by *substantial evidence. City of Kansas City v. Oxley,* 579 S.W.2d 113, 115[2] (Mo. banc 1979). *Substantial evidence* is defined as "evidence from which the triers of fact reasonably could find the issue in harmony therewith." *State v. Gregory,* 339 Mo. 133, 96 S.W.2d 47, 51 (1936). Our review, and determination that the evidence shows no criminal agency between the defendant and the incendiary fire, consciously employs that standard. That the proof is by circumstantial evidence does not vary the principle. *State v. Thomas,* 452 S.W.2d 160, 162[1–3] (Mo.1970); *State v. Lasley,* 583 S.W.2d 511, 515 (Mo. banc 1979). In the *Oxley* case, nevertheless, the court acknowledged that although the standard of appellate review was whether the conviction rests on *substantial evidence,* [l. c. 115] "review must depend in some measure upon the degree of persuasion required." The court cited the *Gregory* exposition of the scope of review of a criminal conviction [96 S.W.2d l. c. 52]:

> In a criminal case liberty and sometimes life are involved, and there cannot be a conviction except upon a finding of guilt beyond a reasonable doubt. Necessarily, therefore, *it becomes the duty of an appellate court as a matter of law to decide whether the evidence was sufficient to induce a belief of the defendant's guilt beyond a reasonable doubt in the minds [of the trier of the facts] ..."* [emphasis supplied]

The court in *Oxley,* notwithstanding, rendered opinion on the traditional *substantial evidence* test of appellate review.

In recent decision [*Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)] the United States Supreme Court announced as a matter of due process of law the constitutional principle presaged by *Gregory* that a court must consider, not whether there was *any* [substantial] evidence to support the state court conviction, but whether there was sufficient evidence to justify a rational trier of fact to find guilt *beyond a reasonable doubt. Jackson* was an attack against the state conviction by federal habeas corpus Rule 2254. The *Jackson* principle of criminal review was posed to our Supreme Court en banc in *State v. Holt,* 592 S.W.2d 759 (Mo. banc 1980), but was not treated definitively, since the *Holt* court was satisfied that the evidence supported conviction by either standard. The court withheld determination [l. c. 774[27]] "whether the *Jackson* standard applies to a direct review by this court of a conviction." We are compelled to the conclusion, notwithstanding *Jackson* was a collateral attack of a criminal conviction, that the constitutional principle obligates a state court to the *beyond a reasonable doubt standard* on direct review. *Jackson* merely extends the rationale of *In re Winship,* 397 U.S. 358, 364[8], 90 S.Ct. 1068, 1073[8], 25 L.Ed.2d 368 (1970) that

> the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

The *Jackson* decision merely extends to appellate review of a criminal conviction, as a matter of due process, the very standard *Winship* employs for a trial conviction, as a matter of due process [*Jackson,* 443 U.S. l. c. 318, 99 S.Ct. l. c. 2789];

> After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must not be simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding

evidence was not sufficient for submission of the offense or conviction of the defendant on the charge. *State v. Bunton*, 453 S.W.2d 949, 952[4–7] (Mo.1970).

The judgment of conviction is vacated and the defendant is ordered discharged.

TURNAGE, P. J., concurs.

MANFORD, J., dissents in separate opinion filed.

MANFORD, Judge, dissenting.

Try as I may, I cannot reach the same conclusion as that of the majority opinion, and therefore dissent for the following reasons: (a) I do not interpret the critical facts upon the record in the same manner set forth in the majority opinion and (b) I do not agree that the majority opinion follows the rule requiring this court to consider all facts and all favorable inferences therefrom in a light most favorable to the state, and that all contrary evidence and inferences therefrom be disregarded.

The majority opinion correctly outlines the evidence that the owner and the family of the dwelling were being harassed, that the dwelling was broken into, that the woman of the dwelling was raped and that she left the dwelling to take up residence with relatives. The evidence further shows that the owner of the dwelling gave the key to the dwelling to appellant with the request that appellant check on the dwelling. This evidence, in reality, serves no other purpose than to place appellant at the scene of this arson and affords appellant the opportunity to commit the arson.

Appellant, with an associate, arrived at the dwelling around midnight. Appellant backed his employer's van into the garage. This activity, accompanied by the sound of breaking glass, attracted the attention of a neighbor. The neighbor called the police. Two policemen arrived, talked with appellant and his associate, looked through the house and garage (but not the basement), secured the license number of the van, determined that the key in appellant's possession fit the front door and then departed. One police officer was asked, at trial, to note any unusual observations he might have made while in the house. At this point in the trial, the following conversation occurred:

"Q. Did you notice anything unusual about the house while you were there?

A. No, I didn't at that time. I could smell something but I've got hayfever and was all stopped up and I couldn't really tell what it was I was smelling at the time."

These officers left and about 1:10 a. m., the officer who testified above that he may have noticed an unusual odor, was again dispatched to the dwelling because of the blaze. In the meanwhile, the neighbor who had earlier contacted the police, testified

---

of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt" ... Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

The court in *Jackson* announces no novel function for a state appellate court. Our constitutional jurisdiction extends to the direct review of criminal convictions. That jurisdiction encompasses determinations of complaint that the evidence does not support conviction. *Jackson* announces merely the principle of due process that a criminal verdict may not stand when a court of review determines that on the record evidence no rational trier of fact could have found the proof of the crime beyond a reasonable doubt.

*Jackson* imposes a more stringent view of the evidence than does the *substantial evidence* test to *sustain* conviction. In a word, *Jackson* grants a defendant a more favorable review. Our opinion employs the traditional *substantial evidence* quantum to *vacate* the conviction. Thus, even after a view of the evidence most favorably to the prosecution, we still find the State failed to prove the criminal agency of the defendant by substantial evidence—let alone that a rational jury could have found that element of proof beyond a reasonable doubt. We conclude, as did our Supreme Court en banc in *Holt*, that by whatever standard, the record evidence does not support that element of the proof. For that reason, the conviction must be vacated.

that he and his wife had just gotten into bed, " * * * and we couldn't have been in bed maybe 5 minutes and then we heard like a big puff, two big puffs coming from across the street." The neighbor peered through the window and observed "flames shooting out of the window (basement) well". The neighbor proceeded across the street and as he approached the dwelling, observed the van occupied by appellant and appellant's associate. At trial, the neighbor was asked to relate what happened after he noticed the van:

"Q. Okay, and they were in the driveway?

A. Coming out of the driveway.

Q. Did you overhear them say anything?

A. Just, 'Let's get out of here.' And then I shouted at them."

When the neighbor shouted at the occupants of the van, there was no response. The testimony reveals the following:

"Q. I shouted at them to stop and pounded on the side of the van and said 'Where are you going?' and there was no reply. And I said, 'Say there's a fire.' And they said, 'Yes we know and we're getting out of here', and then they just, they took off, you know (indicates) varoom down the street."

Fire officials and police authorities arrived on the scene to extinguish the blaze. Arson experts were dispatched to the scene. The cause of the blaze was determined to be gasoline soaked clothing and cardboard strung out in the basement and ignited by the flame on the gas hot water heater.

This dwelling (house) was located in Clay County. At approximately 2:00 a. m., appellant and his associate were stopped in Jackson County a short distance from appellant's place of employment. When the police stopped them, one police officer detected a strong odor of gasoline coming from the van. This officer inspected the interior of the van and his testimony was as follows:

"Q. Please relate to the jury what you smelled and what you did?

A. It was a strong odor of gasoline.

Q. All right sir, so what did you do?

A. And at that time I then inspected the interior of the van. And in the floorboard I found a large puddle of what appeared to be gasoline. And it was eating away at the rubber floor mats. Also you could tell that it had began to evaporate. And for fear of losing the evidence through evaporation I then took a sample of the floor mat and tried to preserve what I believed was gasoline."

After testifying why he thought the liquid found was gasoline, the officer was asked to identify the location within the van and this is what the evidence reveals:

"A. This was a Chevrolet van and you have a driver's seat and a passenger's seat. And the back area was empty for transporting purposes, I suppose. In between the two seats on the floor (indicates) *it would be to the right of the driver and to the left of the passenger right between the two front seats.*" (emphasis added)

The majority opinion, after referring to the foregoing testimony of the officer regarding the location of the puddle of gasoline, then turns attention to the evidence offered by appellant's employer. The majority opinion concludes that the "employer Walton explained that a gasoline container was often carried in the front area of the van as a precaution against an empty tank."

I must disagree with the majority view on the employer's testimony. What he testified to is as follows:

"Q. *All right, did you ever let Mr. Siraguso use the truck with permission for his own use?*

A. *Yes, I have.*

Q. *Now, can you tell me whether or not prior to June the 9th you had ever had an occasion to keep a can of gasoline in the truck, and if so for what purpose?*

A. *Well, now, the vehicle being used on the route we, or I, had previously used a two gallon container of gasoline strapped to the back of the wire mesh which separates the front cab from the back loading area of the truck for the prime purpose, primarily, for running out of gas on the freeways because this vehicle carries approximately close to fifteen hundred to two thousand dollars worth of merchandise and money collectively together. And one thing that we didn't want to do was to leave it out on the freeway which we do travel a lot of times. We'd use a two gallon can of gas.*"

In my reading of that testimony, I find that the employer testifies that the extra container was affixed in a location not "in the front area of the van" as the majority opinion concludes, but in fact was located to the rear of the area where the puddle of gasoline was found by the officer. The continued testimony of the employer is of further interest in that at no time does he testify that on the date of the arson was the extra container in the van. In fact, when his testimony is further viewed, a contrary inference arises. He testified:

"Q. All right, and did you do that all year around or did you do that primarily during the winter months and why?

A. Well, we mainly done it during the winter months because we found out during the winter months that's when you broke down and ran out of gas, primarily running out of gas at times. It was hard to get anybody to come out because they'd be doing other things and we couldn't get a response to get the vehicle off of the freeways one way or another. So, primarily we had it during the winter time. Come up to the summer it was just too heavy, too hot and I had just thought primarily that it was too much to be kept in the truck during the summer time.

Q. The danger factor?

A. Well, the fumes aspect of it, the heat, and the material that is kept in there could possibly cause some type of a bad fire.

Q. Now, you checked that van from time to time, did you not?

A. I have, yes, periodically.

Q. And it was then under your control, and near your place of business every day, wasn't it?

A. Yes.

Q. All right, had you looked at it and noticed any fumes or odor of gasoline in the area where the can had sat prior to June the 9th, 1978?

A. Well, I can't say I really noticed any particular odors other than what is usually there. *I didn't notice any extra situation (sic), but there is a certain amount of odor that's left.*"

The arson occurred on June 9, 1978. From the foregoing, it is my contention that the jury could properly infer the odor of gasoline observed by the officer exceeded even the amount that the employer states was attributable to the carrying of the extra container; the jury could infer that no extra container for the use of the employer's business was in the van at the time in question because the employer never testified that such container was in the van; plus, by the employer's own testimony, the practice of carrying the extra container was not followed in the summer months because it was a fire hazard. In addition, the employer's testimony locates the extra container in the van at or in an area to the rear of where the puddle of gasoline was located, and the jury thereunder could properly infer that gasoline, other than the extra container used for business purposes, was transported to the scene of the arson by appellant and his associate.

The majority opinion references the testimony of the employer that appellant had personal use of the van. That is not disputed on the record. The employer testified he knew appellant had extra or odd jobs and made use of a lawnmower. The employer, in his testimony, only speculates that appel-

lant carried the mower in the van from time to time. The critical evidence on this issue comes from the testimony of the appellant himself, because in answer to his counsel's question concerning the odd jobs, appellant not only confirms that he did not have such an odd job on the date in question, but responds in a much broader scope, thusly:

"Q. All right, do you have any other part-time jobs or did you have any other part-time jobs at that time?

A. At that time, no, I didn't."

It is my feeling that since the employer's testimony permits the aforementioned inferences, it also follows that the jury could have inferred that appellant transported the gasoline (and hence the puddle of gasoline) to the location of the arson.

Before turning to the question of the majority analysis of circumstantial evidence and the rule requiring this court to accept the facts and inferences in support of the verdict, one more area of evidence bears discussion. The majority opinion declares:

"The evidence raises clear inference that the process of combustion was of a duration beyond the presence of the defendant on the premises that night."

I cannot agree that the evidence suggests, let alone "supports" such an inference. The evidence places appellant and his associate on the premises anywhere from an hour to an hour and 10 minutes. Although there were two witnesses who testified, as experts, regarding arson, neither witness attributed any time relationship between the time the clothes were soaked with gasoline and the time that the actual ignition took place. What one expert did testify to is that gasoline soaked clothing was found as close as 10 feet from the water heater and that ignition was caused by the gasoline vapors coming into contact with the flame on the heater. There is nothing to support the conclusion reached by the majority opinion, and this question was one of fact which should be left to the province of the jury. It is just as reasonable to declare that the jury inferred appellant was on the premises a sufficient duration between the

time of the soaking of the clothes and the instant of the ignition or combustion. The majority opinion overrides the trier of fact on this point and draws its own inference premised upon no evidence as to the required amount of time involved.

Without a doubt, two conclusions can be drawn from the evidence in this case. There was an arson of a dwelling place; and the evidence against appellant was circumstantial. The majority opinion concludes as a matter of law the evidence was insufficient to submit the issue of guilt or innocence to the jury. I cannot agree.

Without unduly belaboring the point concerning the evidence and with regard to the foregoing relative to the evidence, it suffices to say that this appellant went to the dwelling and was there for anywhere from one hour to one hour and 10 minutes. The majority opinion relies upon *State v. Miller*, 536 S.W.2d 524 (Mo.App.1976) for the proposition that there must be more than mere suspicion of a criminal act. *Miller* can hardly be considered controlling in the instant case because *Miller* reversed a conviction of an accused who was at the scene of a burglary the day prior to the commission of the criminal act and the state merely contended the accused may have observed the existence and whereabouts of stolen property. Incidentally, in *Miller*, the accused was arrested five days after the offense some 100–120 miles from the scene and while merely a passenger in a vehicle not owned by the accused.

After the ignition of the gasoline soaked clothing occurred, appellant and his associate fled the scene. They were in the process of driving the van down the driveway when confronted by a neighbor. It must be remembered that the only claimed purpose for appellant to have been in the dwelling at that time was to protect the dwelling on the owner's behalf. What did appellant do? The evidence shows the neighbor heard a voice from within the van saying, "Let's get out of here". After being confronted by the neighbor, a voice from inside the van stated, "Yes we know and we're getting out of here". The witness then stated that the

van rapidly drove away. The witness, on cross-examination, stated that as best he could recall, the occupants of the van might have stated, "There is a fire, we're getting out of here, call the police and call the fire department." The evidence reveals that appellant asserted he told the neighbor to call the police and fire departments. The issue is that the evidence gave rise to a question of flight. Flight alone does not suffice as a circumstance for conviction, but when coupled with other circumstances, evidence of flight is a circumstance to be considered by the jury. This question, under the facts of the instant case was for the jury and not this court to resolve. *State v. Castaldi*, 386 S.W.2d 392 (Mo.1965) stands for the proposition that flight from the scene is, by itself, insufficient to support a conviction. However, the court, in *Castaldi*, was quick to point out that the accused had left the scene with another with the explanation that the claimed offense had occurred in a remote area and the accused had no other means of leaving the area. The court pointed out that such action alone was not sufficient to sustain a conviction for tampering with an auto. In the instant case, appellant was at the scene of an arson. Contrary to what the majority opinion assumes, the jury could have reasonably inferred from the evidence that appellant was on the premises a sufficient time, he had the opportunity to commit the offense and then when ignition occurred, appellant fled the scene. Giving appellant all the benefit of doubt regarding the leaving of the scene, the most that can be concluded is that he was returning the van to the place of his employer's business.

Since the only purpose for appellant to have been at the dwelling was for the protection thereof, when the evidence reveals that appellant left the scene making no further attempt to fight the fire, call the police or call the fire department, such action can hardly be held to be consistent with the very reason why he was at the dwelling. The majority opinion passes this off as human fear and concludes that such action is consistent with a hypothesis of innocence, see *State v. Castaldi, supra.*

*Castaldi* also stands for another proposal in that flight is a circumstance to be considered against an accused in connection with other evidence of crime. Under the facts of the instant case, appellant was on the premises, an arson occurred, appellant fled the scene and was arrested in another county some 40–50 minutes later, and gasoline (puddle of gas) was found in the van. This chain of circumstances is consistent, unto itself, with a hypothesis of guilt. The majority opinion, in citing *State v. Eye*, 492 S.W.2d 166 (Mo.App.1973) declares the circumstances of the instant case to be consistent with appellant's innocence as they are with his guilt. *Eye* hardly stands as controlling in the instant case, for that case involved an accused being arrested some 3–3½ miles from the scene of a burglary without any evidence of the accused being nearer the scene of the burglary; nor was there any other evidence to place the accused at the scene of the offense. *State v. Eye, supra*, also stands for the rule that appellant's actions do not exclude every reasonable hypothesis of innocence.

The facts in the instant case form a chain of circumstances from which the jury could reasonably infer the guilt of appellant. While the majority opinion relies heavily upon the consistency versus the inconsistency requirement in cases involving circumstantial evidence, the majority opinion overlooks a very important part of that rule, which is:

"First, the facts in evidence and all favorable inferences reasonably to be drawn therefrom must be considered in the light most favorable to the state and all evidence and inferences to the contrary must be disregarded ... (citations omitted) Second, when the state's case rests upon circumstantial evidence, 'the facts and circumstances must be consistent with each other and with the hypothesis of defendant's guilt, and they must be inconsistent with his innocence and exclude every reasonable hypothesis of his innocence ... (citations omitted) Third, the prevailing circumstantial evidence rule, supra, is realistically tempered in its

application since '[i]n a case involving circumstantial evidence the circumstances need not be absolutely conclusive of guilty, and they need not demonstrate impossibility of innocence[;] . . . the mere existence of other possible hypothesis is not enough to remove the case from the jury.' " *State v. Franco*, 544 S.W.2d 533, 534, 535 (Mo. banc 1976), cert. denied, 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977).

In my surmise of the evidence in the instant case, the majority opinion violates the rule announced in *State v. Franco, supra*, in three separate but cumulative ways, and thus arrives at the conclusion (erroneously) that the evidence was insufficient to submit to the jury. First, the majority opinion predicates its conclusions upon circumstances and inferences therefrom not to the state's favor but to appellant's. Secondly, the majority opinion reaches the conclusion, without sufficient basis of fact upon this record, that appellant was absolutely innocent.

While the majority opinion, by footnote, clearly denotes the federal rule supporting the proposal that evidence must be viewed in the light most favorable to a conviction, see *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), it is the failure to follow the rule in *Jackson*, coupled with the failure to adhere to the rule in *Franco*, which leads to the conclusion reached by the majority. It is interesting to note that in the *Jackson* decision, at 99 S.Ct. 2793, the federal court declared:

"Under the standard established in this opinion as necessary to preserve the due process protection in *Winship*, a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—*even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.*" (emphasis added)

Thirdly, and lastly, the rule in *State v. Franco, supra*, provides that the mere existence of another hypothesis is not sufficient to remove the cause from the jury. By even the most strained view that there existed a mere existence of another hypothesis, and the facts herein do not support even that conclusion, the matter was for the jury's determination. The record reflects that the trial judge was faced with that question when appellant moved to dismiss on the basis of the insufficiency of the evidence. The trial court properly overruled the motion. This court now attempts to invade the province of the jury and this is, in my opinion, a conclusion totally unsupported by the evidence upon the record.

For and upon the foregoing bases, I would affirm the judgment of conviction.